JEFFIE L. BENTLEY *v.* STATE OF ARKANSAS

5716                                           480 S.W. 2d 346

Opinion delivered May 22, 1972

*Joel C. Cole,* for appellant.

*Ray Thornton,* Atty. Gen., by: *Henry Ginger,* Deputy Atty. Gen., for appellee.

J. FRED JONES, Justice. Jeffie L. Bentley was charged on information filed by the prosecuting attorney of Pulaski County with the crime of involuntary manslaughter in that on the 18th day of June, 1971, he did unlawfully, feloniously, drive a motor vehicle in a reckless wanton disregard of the safety of others and while so operating said vehicle, did strike and injure Mr. Lester H. LaPorte, and that Mr. LaPorte died from the effects of such injury.

A jury was waived and Mr. Bentley was tried before the Judge of the Pulaski County Circuit Court sitting as

a jury. He was found guilty and sentenced to two years in the state penitentiary. On appeal to this court Mr. Bentley relies on the following points for reversal:

"The state did not prove that the deceased died as a proximate result of the injuries sustained.

There is insufficient evidence to sustain a conviction for involuntary manslaughter."

The tragedy in this case occurred about 1:30 or 2:00 p.m. on June 18, 1971, when the decedent, Lester LaPorte, while traveling south on Interstate Highway 40 with two passengers in his white Nova station wagon, stopped the automobile on the west shoulder of the highway to investigate engine trouble, and was struck by a Mack truck pulling an empty "lowboy" trailer. The truck was also traveling south on Interstate 40 and was being driven by the appellant Bentley. Mr. LaPorte sustained massive injury to both buttocks in the accident and was taken immediately to the Veteran's Administration Hospital where he remained until his death on June 30, 1971.

The appellant argues under his first point that the state did not prove that the deceased died as a proximate result of the injury sustained. We do not agree with this contention. Dr. William Dale Morris, Jr., a medical doctor who was on call at the Veteran's Administration Hospital, testified that he did not see or examine Mr. LaPorte upon his admission to the hospital. He testified, however, that he did see and examine Mr. La-Porte two or three times while he was in the hospital and that he pronounced him dead upon his expiration. Dr. Morris testified that Mr. LaPorte had suffered "a traumatic amputation, or removal by force, of both his buttocks, the muscles aroung the anus and rectum," and on direct examination he was asked and answered the following question:

"Q. What did he die from?

A. Well, cause of death was overwhelming infection, plus the fact that his kidneys quit functioning, *both*

*caused by massive injury he suffered."* (Emphasis added).

In answer to questions concerning the death certificate, Dr. Morris was asked and answered a question as follows:

"Q. And what did you list as the cause on that certificate?

A. There were several causes. The two I mentioned; he had sepsis or overwhelming infection. Secondly, his kidneys quit functioning, both of which we attributed to injury he had sustained some weeks before."

We are of the opinion that Dr. Morris' testimony, as above set out, is substantial evidence that Mr. LaPorte died as a proximate result of the injury he sustained.

As to the appellant's second point, Ark. Stat. Ann. § 41-2209 (Repl. 1964) defines involuntary manslaughter in language as follows:

"If the killing be in the commission of an unlawful act, without malice, and without the means calculated to produce death, or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter. Provided further that when the death of any person ensues within one [1] year as a proximate result of injury received by the driving of any vehicle in reckless, willful or wanton disregard of the safety of others, the person so operating such vehicle shall be deemed guilty of involuntary manslaughter."

Mr. R. A. Carnahan, a trooper with the Arkansas State Police, testified that he investigated the accident and when he arrived at the scene he found the station wagon damaged on the rear end and left side; that both the station wagon and the truck-trailer were off the highway on the west side. He said that the Nova station wagon was knocked 137 feet from the point of impact. He said that the west side of the highway had two concrete driving lanes 12 feet wide. He testified that he determined the

station wagon was off the concrete driving lane and well over on the asphalt shoulder of the highway when struck, and that the point of impact was four feet and 11 inches from the edge of the concrete driving lane over on the ten foot wide asphalt shoulder. He testified that the truck left 15 feet of skid marks in a straight line five feet 11 inches from the outside driving lane to the point of impact with the automobile. The officer testified that he talked with the appellant at the scene of the accident and that the appellant stated he was going eastbound toward North Little Rock and was in the righthand lane of the highway, while a tanker truck was traveling beside him in the inside lane; that one of the people around the automobile stepped out in front of the appellant's truck and he locked his brakes to avoid striking the person and the unit jacknifed causing his truck to strike the parked vehicle.

Mrs. N. P. Ford testified that she was driving north on Interstate Highway 40 and saw the collision. She said that she saw the automobile on the west shoulder of the southbound lane of the highway and saw the truck strike the automobile. On this point she testified as follows:

"A. I saw a big truck pull off the highway and hit a parked car with two men standing outside.

Q. Could you tell it a little more detailed? Was this car parked on the highway?

A. No, it wasn't on the highway. It was on the shoulder.

* * *

Q. And what did you see this truck do, again?

A. It was pulling off the highway and I commented to my husband, 'That truck is going to hit that car.' Then I turned and looked and then I saw pieces of the car flying.

Q. When you say, 'pulling off the highway,' do you mean onto the shoulder?

A. Yes, toward the car. I realized the truck was headed straight for the car.

Q. So the truck had been off the shoulder for some little time when it was headed toward the car?

A. Right.

Q. You don't know how many feet when you first saw it?

A. No."

As pointed out by the appellant in his own testimony at the trial, Mrs. Ford was traveling north on Interstate 40 and the collision occured across the median from her point of observation; but Mr. Ralph Sparkman, an employee of the Conway Public Schools, testified that he was driving south in the outside lane of the highway and also saw the collision. He said that immediately prior to the collision the appellant passed him in a usual and uneventful manner. He said that after the truck passed him and it had traveled about seven or eight car lengths ahead of him, it moved back into the outside lane ahead of him, and just continued to move toward the shoulder of the highway until the dual wheels were off the concrete driving lane onto the asphalt shoulder. He said that the dual wheels of the appellant's vehicle stayed on the asphalt shoulder of the highway until the impact with the automobile. He said that he did not see the automobile before the impact but that the truck was perhaps 15 or 20 car lengths ahead of him when the impact occurred. On cross-examination this witness testified that when the truck first pulled back in front of him after passing and continued to move toward and onto the shoulder of the highway, he thought the truck was pulling over to stop, but there was no signal light indicating such intention. He said that it appeared to him that the truck driver was going to stop or was asleep. He said that he did not see the automobile

on the shoulder of the highway ahead of the truck, but that he was watching the truck to see if it was going to pull completely off the highway or back onto the highway. This witness testified that after the collision, the appellant said a few words to him and said something about a truck being beside him and someone stepping out into the highway in front of him, but this witness testified that he saw no other truck on the highway at that time and place.

Mrs. Marsha Little testified that she was riding in the station wagon at the time it was struck by the truck. She said that she was sitting on the passenger side in the station wagon and Mr. LaPorte was driving. She said that the station wagon motor started missing or something and that Mr. LaPorte drove onto the shoulder of the highway and stopped the vehicle and he and Mr. Weiderman, the other passenger in the station wagon, got out of the vehicle on the righthand side to investigate the trouble. She said that the hood was up on the station wagon and that Mr. LaPorte was at the right side of the station wagon and Mr. Weiderman was at the front of it at one point, but that is all she remembers as to the position of the two men in relation to the station wagon. She said that she remained in the station wagon and does not know where the two men were, in relation to their vehicle, at the time of the collision impact.

The appellant testified that he was employed as a truck driver for McConnell Heavy Hauling and had been so employed for approximately nine years. He testified that he was driving the truck south on Interstate Highway 40 between 55 and 60 miles an hour and as he came over a little rise in the highway, he saw the decedent's station wagon sitting on the shoulder of the highway approximately six inches, but no more than one foot, from the edge of the concrete traffic lane. He testified that when he was within 50 or 55 feet of the station wagon, a man stepped from near the station wagon, one full step, right out into the highway in front of him. He said that he hit his brakes so quick and hard his truck swerved sideways and that he could never get it straightened back up before it struck the station wagon. The appellant denied that he passed Mr. Sparkman just

prior to the collision. On cross-examination the appellant testified that he did not pass any moving vehicle from the time he came on the interstate at Conway. He testified that when the man stepped from near the parked station wagon into the traffic lane in front of him, he slammed his brakes on hard enough to leave skid marks. He testified that he saw his own skid marks as well as the ones about which Trooper Carnahan testified and that the skid marks referred to by the officer were not made by the appellant's truck. The appellant also testified that the officer was mistaken about the tire marks on the shoulder of the highway because those marks were made by smaller tires than the ones on appellant's vehicle and were not tracks or tire marks made by his vehicle.

A review of our cases will indicate that in most prosecutions for involuntary manslaughter in "driving any vehicle in a reckless, willful or wanton disregard of the safety of others," under § 41-2209, *supra,* the case is submitted to the jury with proper instruction on the lesser degree of the offense as set out under "negligent homicide" in Ark. Stat. Ann. § 75-1001 (Repl. 1957). The only real difference in the two statutes is in the penalties that may be assessed and the word "willful" is not included in the lesser offense of negligent homicide. Thus it appears clear that if the homicide results from the operation of a vehicle in a reckless *or* wanton disregard of the safety of others, the penalties provided under either statute may be imposed. But if the homicide results from the operation of a vehicle in a *willful* disregard of the safety of others; or if a *willful* disregard is charged and proved in addition to either or both of the other two elements; "reckless" *or* "wanton" disregard, then the offense could not be negligent homicide but could only be at least, involuntary manslaughter.

In the case at bar a jury was waived and the trial judge, sitting as a jury, tried the case on its facts as well as the law. The question before us on appeal is whether there was any substantial evidence to support the judgment, and in considering this question we view the evidence in the light most favorable to the appellee. *Baker* v. *State,* 237 Ark. 862, 376 S. W. 2d 673. From the record

before us we conclude there was substantial evidence from which the trial judge could have found that the appellant drove his truck along the blacktop shoulder of the highway in a reckless disregard for the safety of the decedent and the other passengers in the station wagon parked on the shoulder of the highway.

The judgment is affirmed.